Good morning. My name is Gary Laughlin. I'm here on behalf of Western States Paving. Could you speak up a little bit, Mr. Laughlin? I would love to go to your predecessor case. I'm sorry? With your predecessor case, in my office, I'm referred to as a roadkill on the information superhighways. I see. Okay. All of you in terms of understanding. I tell people I'm more of the pinball generation than the video games. In this case, John Aramble, who is the vice president and general manager of Western States Paving, submitted three bids for asphalt and paving work on construction projects. On each occasion, those bids were rejected. Those quotes were rejected on behalf of quotes submitted by DBEs. And Mr. Aramble's quotes were between $30,000 and $100,000 lower. Those quotes were rejected because the contracts had contained in them mandatory condition of award usage of DBEs or expenditures on DBEs. I think we have two issues here. We have the facial alleged violation of the Fifth Amendment on the TEA, and we also have the as applied. And if you could get to what you think is your strongest argument first as between the two, it would be very useful. All right. I think that the focus of this case and perhaps the strongest argument is the as applied. I don't want to indicate that I don't think the facial issue and the underlying requirements of Congress are given short shrift. We understand that. I think what we need to do is look at what the regulations state and what they require. The regulations adopted require that there be a national tens percent aspirational goal. Somehow the Department of Transportation believes the word shall, as enacted by Congress, now means aspirational rather than imperative. And they require that each in response to Adirondack and to ensure narrow tailoring, the federal government asks that each recipient of funds under T-21 analyze local market and ensure that the conditions are met to determine if there is indeed discrimination. And the regulations authorize but do not require the use of race conscious efforts and methods. And I ask, and bear with me while I read a couple of things that support that, if you read the government's brief, the United States brief on page 24, they state legislation mandating the use of race conscious contracting preference nationwide, even in regions where discrimination does not persist, would raise more difficult questions. On page 25 they state, regulations are designed to assist states and other recipients in determining when, if at all, race conscious measures are manifestly necessary to overcome the effects of identified discrimination in a particular jurisdiction. On page 28 they indicate, DOT's regulations meet this standard because they are designed to assist states in ensuring that race conscious are a problem and only as a last resort when race neutral relief is insufficient. They make a similar statement on page 29. As I understand it, the state of Washington, as distinct from the federal government, appears to concede that there is no evidence in the record of past discrimination with respect to any protected group. Am I reading that correctly? Yes, sir. You are. And the United States government also seems to concede that. How can they concede that when the legislation itself made findings generally about discrimination against all of them and adds subsection H, their overall goal must provide, in fact, it lists all of these categories as presumptively discriminated against in the legislation. I believe. And at least as far as I understand from the briefs, all the categories which were favored in Washington are specifically listed as presumptively discriminated against. I don't, if, then we would step back to the underlying. That's the legislation, never mind the brief. Yes. That's the legislation. And doesn't it specifically list them as presumptively discriminated against? I don't, I don't. They are presumptively members of the socially disadvantaged and economically disadvantaged categories, but that the underlying legislation, when you read the congressional reports and when you read the government's brief, did not make a finding that each and every location in the United States had discrimination problems. The discrimination findings were in varied locations, in varying degrees, varying amounts. And I think in the government's brief, there were discussions of Atlanta, New Orleans, D.C., Denver, and problems, I believe, in North Dakota. But I don't believe that there was ever a finding in Washington or in the Pacific Northwest from any that I remember. Well, but if the legislation itself is constitutional and it lists them as presumptively so, doesn't the burden then shift for someone to present evidence rather than for them coming forth to prove it, but to produce evidence that they are not discriminated against, and as I understand this record, no such evidence was brought forward? That's correct. But I believe that the prior enactments, the predecessors to T21, were viewed as requiring a 10 percent set-aside in the contracts, and it was an across-the-board. The regulations changed as a result of Adirond, and the government's belief that that 10 percent across-the-board, one-size-fit-all was not appropriate and would not survive strict scrutiny. And the government then put the burden in narrowing tailoring, the narrow tailoring, that the recipient had to analyze the local market conditions. And as I read from the government's brief, they have to determine that discrimination or its lingering effects must exist in the local market before you use race-conscious remedies. Well, I think Judge McKay is raising the question of burden here. Who has the burden at this point? If presumptively the national legislation is valid and makes these findings from a national level, is it your burden or the DOT's burden to establish that that also applies with respect to the State of Washington contracts? I think it's the DOT's burden, sir. Why? Because it's not a one-size-fit-all, that the we have a meshing of the cases that have not yet been done. I believe we have Croyson or, excuse me, we have Hunt, Shaw v. Hunt, that says merely because a legislature or a jurisdiction finds discrimination in one location, they can't use that to justify race-based remedies in another location. Now, we also have the language that says that Congress pates with a broader brush. But we also have Adaran that says State, local, and Federal governments are held to the same standards when it comes to equal protection. So how do we jive the broader brush approach with the United States government? The broader brush doesn't eliminate the need to inquire of whether race- and sex-based differences occurred in the jurisdiction. Doesn't TEA-21 expressly direct the State recipient, the grantee, to follow the national rules and to make findings of discrimination in its own sector before it can adopt DBE regulations? I believe it does, sir. Isn't that a good indication of who has the burden of doing it? I would hope so. I would hope so. Doesn't the legislation don't both the legislation and the regulations set out a formula for determining those with available information? You must provide from available information to discover that. And didn't they, in fact, follow that formula rather mathematically with such information that was available? I take it you're arguing that you have to go back and relitigate that women were ever discriminated against in Washington. No, sir. I'm not arguing that. You're not? I'm not arguing that they have to go back. You're arguing that they don't presently discriminate against women. I'm arguing that there is no evidence that there is now or there has been discrimination on various protected classes in the State of Washington that the State and Federal government can define. But there's no evidence that any class was discriminated against? They have been unable to present that. They were asked and they said they are not aware of any that has occurred in highway construction contracts administered by the State of Washington. They are also not aware of any discrimination that incurred insurance, lending or bonding. Let me back up. I thought the evidence on the insurance, lending and bonding is that it was greatly improved, not that there wasn't any. No, sir. Their answers to their interrogatories was that they were not aware of any. I think the greatly improved came from the DBE report and the experts report. I think her name was Holt. But if I may back up and answer one of your questions or clarify a little bit more in terms of the formula. The formula you talk about that is established in the regulations is such that is used to determine the aspirational goal. You take a look at the available DBEs as a percentage of the contractors who are available in that area. Then you make adjustments and it is an aspirational goal. Not enforceable, not mandatory, no punishment comes to the State or any recipient for failing to meet it. And then it is the question of how do you then enforce it. And how you reach that is through race neutral means unless or until you have evidence of discrimination or the past effects. But what I want to focus on in this case is what the State did. Race neutral is defined by the regulations as methods, race and gender neutral, are methods that benefit all small businesses. Race and gender conscious are those that benefit DBEs. The State plan and its purpose is not to benefit DBEs, but to benefit women and minorities in contracting. They don't make a pretense of the businesses and DBEs. What happens ñ These awards overbid all go to DBEs, don't they? I'm sorry. I didn't hear. In order to qualify for those awards being made that are above your bid, they have to be DBEs to start with, don't they? In every instance? In the three instances, yes, they were DBEs. And the contractors ñ In the Washington program, they don't award to anybody over if they're not a certified DBE. There would be no reason to award it to somebody who was not a DBE because this contract had the mandatory requirement of a certain percentage be expended on DBEs. What I want to focus on is how the State enforces this and the nature of the race conscious efforts they use. It is a mandatory condition of award of the contract. When you look at the documents that are presented, the documents indicate that if you don't meet the DBE goal, your bid will be considered as nonresponsive. Now, there are ñ in the regulations, there's the ability that if you don't meet the DBE requirement, you may rely on good faith effort. The evidence shows that in the history of the DBE program in Washington, only one contractor was able to achieve the award of the contract without meeting the goals. And that was because that one contractor was the only contractor who bid on it. There is no evidence that anyone has ever achieved DBE ñ achieved the contract without ñ through good faith efforts. And part of the reason is how onerous it is. If you look at the State's definition of good faith efforts, it's that the bidder must show that it took all necessary and reasonable steps to achieve the goal, and by the scope, intensity, appropriateness to the objective, the bidder could reasonably be expected to obtain sufficient DBE participation. The Federal regulations, 49 CFR 2653, are even more onerous if they were to be applied. They have to take all reasonable and available means to solicit. They have to follow up the solicitation to make sure that they really received it and might be interested. They have to break out work, even if the contractor can do it themselves, provide the DBE with plans and specifications to assist them to respond, have to go out and help them obtain credit insurance bonding and obtain equipment, materials, and supplies they need to perform the job. And you have to document that and submit that at the time you submit your bid, which is a flowing process that comes up oftentimes just minutes before the bid is submitted. Counsel, you're just under five minutes. You can reserve if you wish or consume either way. Thank you very much. Well, we will hear from the appellees, and one of you will tell us who's going to speak first and for how long and how you're going to break up your time. Good morning. May it please the Court. My name is Lisa Stark, and I represent the United States, an appellee in this case. I plan to address the Court for ten minutes and respond to appellant's claims that T21 and the Department of Transportation's regulations are racially unconstitutional. Afterwards, Steve Dietrich, an assistant attorney general from the state of Washington, and E. Bronson Potter with Clark County will address the Court for a total of ten minutes about whether the state, the county, and city's implementation of T21 is constitutional. Consistent with every federal court that has addressed the issue, which includes the Tenth Circuit in Adirondack v. Slater and the Eighth Circuit's decision in Grosse Sede and Sherbrooke Turf v. Nebraska and Minnesota, to which the Supreme Court has denied certiorari review in five district courts, this district court correctly applied strict scrutiny and held that T21 and DOT's regulations are racially constitutional. As to compelling interest, the district court, like every federal court that has analyzed T21's legislative record, correctly held that Congress satisfied strict scrutiny because it had a strong basis in evidence to support its conclusion that remedial relief was necessary. As outlined in our brief, Congress, as part of a bipartisan effort, enacted T21 in 1998 amidst three decades of hearings, investigations, and fact-finding missions detailing the numerous discriminatory barriers, past and present, that impede the ability of disadvantaged business enterprises throughout the nation to compete equally for federal highway construction dollars. The legislative record, which appellant failed to attack or contradict with affirmative evidence below, demonstrates the existence of widespread systematic discrimination against DBEs in virtually every aspect of highway business construction, from bonding to borrowing to banking to obtaining competitive prices, insurance, training, union membership, and even business referrals. Is there anything in the congressional history with respect to this Act that localizes it to specific discrimination within the state of Washington? Not to the state, not specifically to the state of Washington. What the record does include is statistical study after statistical study from all regions of the country that demonstrate an underutilization of DBEs in government construction contracts. What about Mr. Laughlin's reference to a portion of your brief which admits that regional differences may apply? I'm sorry, I didn't hear the question. There may be regional differences. As to a facial challenge, which is what I'm here to address, that makes no difference. And the reason it makes no difference is essentially for three reasons. All right. Well, if you're only going to concentrate on facial, then I withdraw my question. Excuse me. I'll save my question for your co-counsel. Very well, Your Honor. And with response to that, the facial challenge as to why is Supreme Court precedent has stated, to the contrary, the Supreme Court has recognized in Croson-Oregon v. Mitchell and Nebraska v. Hibbs that Congress can enact legislation to remedy problems which include discrimination that affect the nation as a whole. As a whole, to hold otherwise would compromise Congress's authority to create, to carry out rather, its constitutional mission. And third and importantly, the absence of evidence as to each region before each state, I should say, is of no consequence here because the Department of Transportation's regulations are designed to allow race-conscious measures only in those states that have a strong basis in evidence that the discrimination or lingering effects that Congress found to exist nationwide exist in the local jurisdiction, and then only to the extent of a last resort when race-neutral measures are unsuccessful. Now, are you getting into the as-applied at that point? I do not believe we're getting into the as-applied. I don't mean to comment on the as-applied. Then I won't ask you any questions about the as-applied. Excuse me? I will not be asking you any questions about as-applied. All right. Please start. If I understood you correctly, you say that the provisions of T-21 expressly require the dony states to find, before they use race-based esoterata in the giving out of contracts, the same past discrimination type of evidence that Congress found as the basis for enactment of T-21. The answer to that is generally yes. I wouldn't use the same language, His Honor, about requiring. I would say that they're designed, the regulations, to ensure that, and what they are is a roadmap, if you will, to tell states what they need to put forward to ensure that their program satisfies the strong basis and evidence standard that the court has set. And it sets out a variety of ways. There are an infinite variety of ways, really, to make that showing. And it's up to the state to make that showing. So if I have a question about whether the state has made that showing, in this case, I should ask not you, but your co-counsel. Absolutely. All right. And if the state has not, if the court were to decide for some reason that the state had not made the appropriate showing, that would not implicate the facial challenge at all, but it would implicate the as-applied challenge. As to whether the regulations are narrowly tailored, we believe that issue is not before this Court, and that is because, as the Supreme Court has stated, and this Court most assuredly knows, a facial challenge to a statute, and this is in the words of the Supreme Court, is the most difficult challenge to mount successfully, since the challenger must establish no set of circumstances under which the law would be valid. Appellant has not and cannot meet that burden. At the outset, the federal program does not require the state to take any action, no less action that is unconstitutional. It merely makes available federal funds under certain prescribed circumstances. Moreover, as I indicated, the regulations are designed to help ensure that remedial measures are used only in states that have a strong basis in evidence that the discrimination and lingering effects that Congress found to exist nationwide exist in the local jurisdiction, and then only as a matter of last resort when race-neutral measures are inadequate. If the Court has no further questions, I ask that you affirm the district court's ruling that T21 and the Department of Transportation's regulations are facially constitutional and yield the remainder of my time to my fellow appellee. Thank you, Ms. Stark. Thank you, Your Honor. May it please the Court. My name is Steve Dietrich, and I'm an assistant attorney general representing the Washington State Department of Transportation and its secretary, Douglas McDonald. Obviously, my comments today are addressed to the as-applied challenge, and I want to get right to the issue of what evidence the state had regarding the lingering effects of discrimination. Preliminary question. Who has the burden, the state or the other? My interpretation of the cases, Adirondack 7 and the Sherbrooke turf case, is that the federal government has the burden to show a compelling interest. To the extent that this Court thinks the regulation delegates some of the narrow tailoring component to the states, I think we have a burden of production. It's pretty clear that all the cases make clear that the opponent has the ultimate burden of proof of showing that the program as applied is not narrowly tailored. So at least that's my frame of analysis here. And with respect to whether the state met its burden of production, we had before the district court some of the very best evidence as to the lingering effects of discrimination in the Washington marketplace, and that is we have a proven capacity of our DBE community to attain about 18 percent of the subcontractable work on federal aid projects. But isn't the relevant evidence evidence of discrimination, past discrimination, in this industry in Washington? I believe, Your Honor, that the rule requires us to show either discrimination or the lingering effects of past discrimination. What we've shown, to get to the narrow point of whether or not there's discrimination, each DBE owner is required to certify that he or she has been the victim of discrimination currently or the past effects when they certify that they're eligible to be a DBE. That's what the regulation requires. They swear to that under penalty of perjury. Every DBE has done that. We have 800 and some affidavits to that effect. Are they required to make out a showing of specific events in the past where they were directly discriminated against? I don't believe so, Your Honor. I think it requires that they attest that they've been discriminated against in this marketplace, in this industry, and in recent time. But it's a good – I'll admit it's a conclusory attestation. You have 800 DBEs? We have – it varies year to year. I think in 2000, which was the focus of much of this case, we had about 800. And each of them has filed a declaration under penalty of perjury that that DBE has been discriminated against? That that person has been discriminated against. And your answers to interrogatories, ER 209, show that you've received exactly three formal complaints of discrimination? Yeah. The opposing counsel uses that interrogatory, and he claims that that's evidence or that that was an admission by the state that we had never seen discrimination in the state highway construction marketplace. That is absolutely not true. What that interrogatory asked was whether we had received complaints alleging racial or gender discrimination against employees of the Washington State Department of Transportation. I'm going to read it to you. Go ahead. Identify all complaints that alleged discrimination occurred against DBEs, apostrophe S, women or minorities in the award or performance of WSDOT-administered contracts. It says three formal contracts. RA consultants investigated by you, found to be without merit, investigation closed. Then it was McAllister Enterprises, insufficient evidence to support the complaint. And another one calling informal complaints, such as bid shopping. Bid shopping has a racial component? Is that your claim? Yes, Your Honor. Any bid shopping has a racial component. DBEs often allege, and Congress found that that is a common problem. So do all subcontractors. The award, Your Honor, that interrogatory talks about the award in administration of a prime contract. That is done by a State of Washington Department of Transportation employees. I didn't understand that, and the State certainly didn't respond to that with the understanding that he was asking for any alleged discrimination occurring anywhere in the state highway construction. I'm just reading it. Identify all. That's pretty clear. In the award and performance. In the award or performance of WSDOT-administered contracts. And you've got two closed, one open. And complaints which you allege are racially tinged because of bid shopping? As if bid shopping didn't exist in race-neutral situations? That's how we responded. Are there 800 DBEs who said we have been discriminated against? We also made available all those certification files which included those affidavits. Now, the fact of the matter is that no one can become a DBE unless he says he's been discriminated against, and when he does become a DBE, he gets a preferential position as far as contracting. Correct? I think that's true. But that is the case. I'm sorry. Well, that is an element of the Federal regulation. That's not some discretionary implementation of the program. That's how the market works, right? You become a preferred contractor. That's how the program works. That's how the program works. I take it that you have had no complaints filed and that you've not treated the certifications as complaints. That's right. That's our interpretation. That's right. That's right. But we did make all of those certification files available to our opponent here. So getting back to the discriminatory effects, we think the best evidence is the attainment that DBEs are able to achieve when we institute the race conscious goals, which has historically been about 18, sometimes as high as 20 percent. That shows the capacity of the DBEs. And then in instances where we don't use goals, which is a substantial volume of our contracts, the most recent year that we have in the record, the attainment drops to 4.5 percent. That's a factor of three or four times. Other courts, the district court in this case, found that to be very compelling evidence of the ongoing effects of discrimination in the marketplace. Judge O'Connor in the Croson case also said that similar substantial racial or statistical discrepancies can give rise to an inference of discrimination. And I believe the Adirondack Court and Sherbrooke Court made similar comments. Do you see any problem with that type of thinking? When preferred, they get 18 percent. When not preferred, they get 4.5 percent. That means that there's discrimination. I don't think it conclusively establishes that. But other courts and Congress have found that sort of evidence very to support an inference of the ongoing effects of discrimination. Are you taking the position that there is evidence of discrimination in this record? Yes. Sufficient to meet the T standard regulations and so forth? Yes, I am. And the way that we follow the rule that tells us some of the sorts of calculations we need to do, the data we need to analyze to determine whether or not there are ongoing effects of discrimination, there is no ---- You seem to be focusing on ongoing effects of discrimination. Well, I don't think the rule is ---- The question was directed to evidence of discrimination, past discrimination. We believe what I just described, the vast discrepancy between goals and no goals. No, I understand. Either or. It's either ---- My next question, then, is discrimination as to which vulnerable class, women, blacks, Aleuts, other minorities? The State does not distinguish on those classifications. We treat all DBEs equally. Is that consistent with your Federal regulations? My understanding is that, yes, the State lacks ---- the regulation says the State cannot divide the DBE goal up into subgroups. Subsection H says your overall goal must provide for participation by all certified DBEs and must not be subdivided into specific groups, specific goals. That's right. That's our understanding. We have to treat them all ---- No claim in this case that you have. In fact, the claim is that you haven't. There's no claim that we've done anything contrary to the Federal regulation. It seems to me the key of ---- one of the keys of this case is how you go about selecting the DBEs. Is there a formula in the national legislation for determining how you go about determining who is a DBE? Oh, there very definitely is. The certification standards are very well defined by the regulation, and the State follows the Federal regulation precisely. It tells what these attestations of discrimination that's required. Oh, sorry. Is it your position that the formula for determining that, if it ---- if applied, would in effect be evidence of lingering discrimination? It is our position that to that ---- with respect to that rule and all the rules, that if you find that the Federal regulation is narrowly tailored, and if you find, as I think you must on this record, that the State complied with the regulation, then we have a narrowly tailored program as applied in this instance. There's no light between what the State did in this case and what the Federal regulation requires. So it's difficult for us to understand how, you know, the Court could hold that the regulation is sufficient, but somehow what the State did was not. I would like to reserve, unless there are questions, the rest of my time for Co-Counsel Potter. You've got 45 seconds for Co-Counsel. Good morning. My name is Bronson Potter, and I represent Clark County. Mr. Laughlin has indicated that I could have a minute or two of his time as well. We'll see how that goes. I'm kind of curious. I thought you would be on this side of the Court. No? There was more room here. Oh, I see. All right. Well, you've confused me. Not much hostility. There was not much hostility. Very good. Very good. Separate and apart from the constitutionality of the State or Federal DBE programs, the county and the city were granted summary judgment dismissing the monetary damage claims against them on the basis that there was no evidence that the city or county engaged in intentional discrimination. My argument is simple because Western States has not assigned error to the granting of that summary judgment to the city and county on those claims and did not address that dismissal in either its opening or reply briefs. So I would argue that they have waived a claim of error in this appeal on the granting of the summary judgment to the city and county. The city and county do not have DBE programs. On the road to projects in question, the city and the county did not have any dealing with the Western States. Mr. Laughlin indicated that Western States submitted bids on these projects, and that's true. They submitted bids to the general contractor but not to either the city or the county. We had no direct dealing with Western States prior to the filing of the lawsuit. All right, counsel, please summarize because you have exceeded your time. Intentional discrimination was defined by this court in Duval v. Kitsap County as requiring knowledge of violation of a right. You've asked about a program being presumptively valid. Here the State tells us what we have to do, 14% DBE level. We were just complying with a contractual provision. We did not engage in intentional discrimination. Thank you, counsel. We'll now have Mr. Laughlin. You have some reserve time. Thank you, Judge. I would like you to consider looking at more of the record than you simply pointed to in terms of evidence of discrimination or lack of it, because if you look at the interrogatories that followed, those interrogatories asked specifically to identify all incidents of discrimination which occurred and then listed the particular category of protected class among African Americans, American Indians, Asian Americans, and the answer was the same to all of them. They were not aware of any. And if you look in ER 210 and following, what I ask you to remember is that the law allows us, allows the State and the Federal Government to remedy discrimination. It does not allow them to remedy disparity. And what evidence the State relies on is just that. If you were to read the transcript of the argument that occurred before Judge Layton, and that's the supplemental exhibit of the Federal Government, the supplemental evidence of record there, 18, Judge Layton asked Mr. Dietrich, so the evidence of discrimination is the difference between the amount of the availability of DBEs ready, willing, and able to do the work and the amount of the level of participation in prior contracts. Is that, in a nutshell, how it's done? Mr. Dietrich says that's our understanding. So they're talking about a disparity. But Croyson and Westman, which is cited in my brief, says that we have to resist the tendency to substitute speculation about disparity or speculation about correlation with proof of discrimination. And proof of discrimination, according to the cases, comes from statistics only when you eliminate all of the nondiscriminatory causes, one of which may be societal discrimination, which the State and Federal Government cannot legislate against, according to the case law. What we have is a program that the Federal Government admits in its footnote to the Adirondack Supreme Court decision that it could not implement in the State of Washington alone as a Federal program because the studies that were done, the benchmark study says they can only use it in about eight states. That's listed in my brief. It is clear that under this evidence, the State alone could not implement this program because it has no evidence of discrimination or its lingering effects. So how then can they implement it together when they couldn't do it alone? Counsel, let me ask you sort of a procedural question. You're up here on summary judgment. Are you asserting that there are questions of fact which would require trial, such as proof of discrimination and so forth, or are you arguing that as a matter of law it was erroneous to deny summary judgment for you? Yes, sir. It was erroneous as a matter of law to deny summary judgment. In other words, there are no fact issues that you see. No, sir. None that would preclude entering summary judgment in our favor. I have about a minute, and I want to take one minute, in fact, to talk about the issue about Congress and the compelling interest. The courts have had to decide what the compelling interest is, because Congress has never given us the benefit of telling us what their interest is. There's no preamble. There's no findings of fact. There's nothing. They've handed the ball out to others. There's a committee report where they say we're going to leave it to the courts to determine if there's a compelling interest and what it is. It's a little surprising. The question is not just a compelling interest. There has to be a strong basis in evidence. They have to identify the type of discrimination and the amount of discrimination with particularity to frame the remedy. One of the faults, I think, in Congress, or one of the problems with Congress, is it never studied where it's been. How can you know where you're going to go if you don't know where you've been? This program has been in effect since 81 or 82 using the same language, but more strongly applied. Not less than 10 percent shall be allocated to DBEs. They don't know how successful it was. It's now aspirational goals. But if you don't know if that money has been well spent and if it has exceeded anything, how do you know what the need is for the program in the future? Thank you, counsel. Your time has expired. The case just argued will be submitted for a decision, and we will hear argument in Thomas.
judges: McKay , O'scannlain, Bea